**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

| | | |
|---|---|---|
| JUANITA TUCKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:20-cv-00902-DGK |
| | ) | |
| MAXIMUS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER GRANTING IN PART SUMMARY JUDGMENT

This is an employment discrimination case. Plaintiff Juanita Tucker alleges Defendant Maximus, Inc. ("Maximus") discriminated against her in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), the Americans with Disabilities Act ("ADA"), the Age Discrimination in Employment Act ("ADEA"), and Missouri common law, and then unlawfully retaliated against her for reporting sexual harassment in violation of Title VII.

Now before the Court is Maximus's motion for summary judgment. ECF No. 57. Holding Maximus has demonstrated entitlement to summary judgment on all claims except Plaintiff's Title VII retaliation claim, the motion is GRANTED IN PART.

### Standard

A movant is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those facts "that might affect the outcome of the suit under the governing law," and a genuine dispute over material facts is one "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court makes this determination by viewing the facts in the light most favorable to the nonmoving

party and drawing all reasonable inferences in that party's favor. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588–89 (1986). To survive summary judgment, the nonmoving party must substantiate her allegations with sufficient probative evidence that would permit a finding in her favor based on more than mere speculation, conjecture, or fantasy. *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007).

### Material Undisputed Facts

With respect to the pending motion, the material undisputed facts are as follows.[1]

Plaintiff Juanita Tucker worked for Maximus between June 2019 and November 1, 2019, as a call center supervisor. She was an at-will employee. Maximus did not train Plaintiff to be a supervisor. Rather, it trained her as a customer service representative, and it relied on the fact that she had supervisor experience on her resume. Plaintiff was 46 years old when she was hired.

Plaintiff was aware of Maximus' Unlawful Harassment Policy, Equal Employment Opportunity ("EEO") policy, and Affirmative Action policy. Collectively, these policies prohibit harassment or discrimination based on any category protected by law. These policies state that reports of alleged improper conduct can be made to a number of people, including any member of management, human resources, or anonymously to the Maximus ethics hotline.

#### July 2019 Written Warning

Plaintiff's supervisor was Anita Thomas ("Ms. Thomas"). Ms. Thomas was an operations manager who began working for Maximus in June 2019. George Reitz ("Reitz") was Ms. Thomas' direct supervisor and the Site Senior Operations Manager. He managed the call center where Plaintiff worked.

---

[1] The Court has limited these facts to those that are undisputed and material to the pending summary judgment motion. Excluded are legal conclusions, argument presented as fact, and proposed facts not properly supported by admissible evidence. The Court has also included inferences from undisputed material facts and facts not controverted properly. *See* Fed. R. Civ. P. 56(c); L.R. 56.1(a).

2

Plaintiff knew Maximus had a policy regarding professional behavior, which stated that unprofessional behavior, including harassment, use of profanity, obscene language, being disruptive or disrespectful, as well as insubordination toward leadership or higher-ranking peers, could result in immediate termination.

Approximately three weeks after Plaintiff began working at Maximus, Ms. Thomas gave Plaintiff a final written warning disciplinary action.[2] Prior to being given this warning, Plaintiff was present for an incident in which Ms. Thomas was told by her supervisor that she (Ms. Thomas) had incorrectly instructed Plaintiff on a point of office procedure. From that point on, Ms. Thomas' attitude towards Plaintiff was negative.

The written warning described four alleged incidents which purportedly led Ms. Thomas to believe Plaintiff's behavior needed to be corrected.

The first incident had to do with Plaintiff allegedly swearing at an employee—which Plaintiff did, in fact, not do—during an orientation on June 27, 2019 (Plaintiff's second or third day of employment), when there was a woman who required medical attention. Paramedics arrived to treat the patient and asked the room of people to calm down. An employee called Plaintiff a "bitch" during this incident, and Plaintiff was sanctioned for not properly de-escalating the situation.

The second incident taking the wrong person to Human Capital (the term Maximus used for Human Resources) for discipline. (The reason Plaintiff took the wrong person to Human Capital was because two individuals switched nametags.)

The third incident involved Plaintiff using her cell phone to take a personal call from her father's nurse while on the production floor. Plaintiff, who apparently was on the stairs outside

---

[2] Maximus' policy allowed corrective action to start at any step in the process (*i.e.*, there was no required progression through various stages).

the production floor when she took the call, did not think the stairs were considered part of the production floor at the time. There were no other incidences of Plaintiff violating this policy.

In the fourth incident, Maximus alleged that Plaintiff improperly allowed a subordinate employee to monitor attendance. In fact, the employee was helping Plaintiff identify employees to get them signed out for lunch.

For each of these four prior incidents, Plaintiff never received a documented counseling or verbal warning about this incident prior to it being included in the final written warning.

The final written warning stated that, moving forward, Maximus expected Plaintiff would maintain a high level of professionalism and follow all Company policies. Although Plaintiff did not agree with the write up, she understood the expectations Maximus had with regard to her future performance.

At some point, the record is unclear when, Ariana Diop, an employee from a staffing agency who reported to Plaintiff, told Plaintiff that her (Diop's) husband, who worked at the same call center, had abused her. Ms. Thomas was aware of the abuse as well and yet placed Diop's husband on Plaintiff's team, with his wife.

On October 10, 2019, Diop was upset, loud, and using profanity after being confronted by co-workers regarding an incident involving her husband. After the confrontation turned into a brawl involving six or seven female employees, Ms. Thomas went through the floor asking everyone to calm down.

Ms. Thomas also asked Plaintiff to try to get everything under control. Plaintiff then directed Diop's husband to help calm her down. Plaintiff did this because it was necessary to avoid the fight getting out of control. Diop subsequently complained to the staffing agency that Plaintiff told Diop's husband to "take care of her" or "go get her," and Diop felt threatened by

4

Plaintiff's statement.

Even though Plaintiff thought the incident was relatively minor, she emailed Ms. Thomas about it because she felt that everything that was happening was being used against her. Plaintiff did not think she did anything wrong by directing Diop's husband to calm her down.

The next day, on Friday October 11, 2019, Plaintiff hid under her desk after a fight between employees that began in the parking lot spilled over into the entryway of the call center, and eventually involved security.

Plaintiff asked to go to the hospital after the incident because she was experiencing anxiety; her heart rate was fast, and she was feeling dizzy like she was going to pass out. Ms. Thomas refused Plaintiff's request and told her "to get [her] anxiety under check and be a big girl." Although Plaintiff's shift ended at 6:00 p.m., she continued working until 6:15 p.m. or 6:30 p.m. When she left work, she went to an emergency clinic due to her blood pressure, but the clinic could not treat her because her blood pressure was too high, so the clinic directed her to the emergency room at North Kansas City Hospital to receive an injection. Plaintiff's blood pressure still had not gone down by the next day (a Saturday), so she went to St. Luke's North Kansas City Hospital and received an injection to lower her blood pressure.

This was the first time Plaintiff indicated to Ms. Thomas that she had any mental health problem. Ms. Thomas did not report this to Human Capital, so Maximus has no record of Plaintiff ever formally requesting an accommodation for a disability.

After this incident, Ms. Thomas shared Plaintiff's medical condition with two other supervisors and managers. Ms. Thomas also teased Plaintiff about it. Plaintiff later complained to Maribel Guerera in Human Capital that Ms. Thomas inappropriately shared information about her medical condition. Plaintiff complained to Reitz about Ms. Thomas disclosing her medical

5

condition to others. He responded (arguably in a joking tone of voice) that he was going to reference Plaintiff as the complainer, and they were going to designate a national complaint day just for Plaintiff.

On October 25, 2019, Plaintiff went to see Alicia Williams ("Williams") in Human Capital to complain about the final written warning she had been given in July 2019. William's only response was that she had "a lot on her plate" and was overwhelmed.

In October of 2019, an agent named David Thomas made sexual comments to Plaintiff that she was "sexy" and "fly." He also came into Plaintiff's office and blew in her ear and down her neck, then told her he knew how old Plaintiff was, but "age didn't make a difference."

Plaintiff immediately reported the incident to her supervisor, Ms. Thomas. When she spoke to Ms. Thomas, she also told her that two other agents had reported that Mr. Thomas was sexually harassing them by coming up to them and playing with their hair and touching them, and they did not like it. At the time, Plaintiff did not know that Mr. Thomas was Ms. Thomas' son. Plaintiff did not learn that Ms. Thomas was his mother until after she was terminated.

Maximus's Human Capital director for the project Plaintiff worked on, Cecilia Montalvo-Silburn, testified that a victim of harassment usually reports the harassment verbally and to her supervisor. She also testified that it was reasonable under the Maximus's company policy for Plaintiff to assume that a report of sexual harassment made to a supervisor will be reported onward to start an investigation. But Plaintiff's supervisor, Ms. Thomas, did not relay Plaintiff's report to management. Instead, three days later she drew up paperwork that alluded to an incident three weeks prior and recommended Plaintiff's termination.

On October 30, 2019, Plaintiff sent an email to Guerra writing that she was "in danger of losing my job over friendship between 2 managers, Anita and Chantelle [Bell]." That same day,

6

Plaintiff sent an email to Reitz asking if she could change managers because she and Anita Thomas "have conflicting personalities." Plaintiff asked if she could transfer to Dallas Baker's team and noted that she "like[d] Maximus and everything it has to offer".

Ms. Thomas and Bell were not good managers. At one time, Maximus rated them as the two lowest performers out of eleven managers. Maximus also had reports that Bell had a romantic relationship with a supervisor she oversaw. This supervisor was able to make anonymous reports of incidents involving other agents by having Bell submit the reports and omit the supervisor's name.

In contrast, Maximus rated Plaintiff 12th out of 84 supervisors throughout Kansas City and Brownsville, Texas, placing Plaintiff in the top 15% in terms of performance.

At some time in October 2019, Maximus investigated Plaintiff's actions with respect to Diop. Montalvo-Silburn, who was based in Texas, traveled on-site to Kansas City to investigate the incident.

On October 31, after receiving approval from management, human resources, and legal counsel, Reitz and Montalvo-Silburn decided to terminate Plaintiff. However, Ms. Thomas instigated the termination, and the termination was made with her input. At the time the decision was made, Montalvo-Silburn was not aware that Plaintiff had accused Mr. Thomas of sexual harassment, or that his mother was Ms. Thomas.

On November 1, 2019, Plaintiff was told she was terminated in a meeting with Montalvo-Silburn, Reitz, and Ms. Thomas. The document purporting to explain why she was terminated stated that since receiving the final written warning, Plaintiff had been coached by Ms. Thomas multiple times on "professionalism, employee relations, following directions, disrespectful behavior, and insubordination," but Plaintiff's

7

response toward peers on many occasions ha[d] been aggressive and [Plaintiff] fail[ed] to make any changes. [Plaintiff]'s lack of situational awareness and lack of judgment could have placed an agent in danger. The agent had previously disclosed to [Plaintiff] that she was in an abusive relationship with her spouse. The day of the incident, [Plaintiff] asked the agent to do a task and the agent was upset, [Plaintiff] then went to her husband and told him to go 'Get Her'.

Ms. Thomas had input with respect to the language used in this document.

Montalvo-Silburn was born in 1966, making her 53 years old at the time of Tucker's discharge. Reitz was born in 1970, making him 49 years old at the time of Plaintiff's discharge.

On November 5, 2019, Plaintiff sent a follow-up email to Guerra apologizing for her initial email and noting that she believed her "termination was unjust and personal." She also reiterated her complaints about Ms. Thomas and another manager, Chantelle Bell.

Shortly after Plaintiff's employment ended, she made a complaint via Maximus' ethics hotline. The hotline report states that Plaintiff believed she was discharged "because of Anita and Chantelle's dislike of [Plaintiff]." Plaintiff did not mention discrimination based on gender, age, medical condition, or alleged sexual harassment.

On November 9, 2019, Plaintiff emailed the project manager for Maximus, LaTonya Avery, and asked for her job back. Plaintiff wrote she "didn't deserve a final write up" and that "the managers who both worked together to terminate me are very difficult to work with, if one or both don't like you, you have to be very careful . . .."

That same day, Plaintiff sent a letter to "Upper Management" asking for her job back. In the three-page letter, Plaintiff set forth several reasons why she believed her employment should not have been terminated. She reiterated that her termination was unjust, and that she did not feel her mistakes were enough to warrant termination. She also wrote that she "can't explain the

motive" for her manager putting her on a final written warning (in July 2019).

The reason Plaintiff did not specifically mention gender, age, or disability discrimination in any of her emails to Maximus because she wanted to protect her job, or get it back, and did not think mentioning discrimination would help her do so.

No particular person was hired to replace Plaintiff. In fact, no supervisors were hired after Plaintiff's termination. Most of the supervisors hired on this project would have been near or over 40 years old due to the amount of experience required for the supervisory position. After Maximus terminated Plaintiff, the members of her team were split up and began reporting to eight different supervisors who were already employed.

Ms. Thomas resigned from Maximus before Plaintiff filed this lawsuit.

## Discussion

Maximus moves for summary judgment on all of Plaintiff's claims. The Court rules as follows.

**A.** **Plaintiff cannot establish a hostile work environment or gender discrimination claim.**

To establish a claim of hostile work environment in violation of Title VII, a plaintiff must show that: "(1) she belongs to a protected group; (2) she was subject to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take proper remedial action." *Lopez v. Whirlpool Corp.*, 989 F.3d 656, 662 (8th Cir. 2021). With respect to the fourth element, "the claim-triggering conduct must be severe or pervasive enough to create an objectively hostile or abusive work environment." *Id*. at 663. Whether an environment is hostile or abusive is determined by considering all the circumstances, including: the frequency of the conduct; its severity; whether it is physically threatening or

9

humiliating, as opposed to a "mere offensive utterance;" and whether the conduct unreasonably

interferes with an employee's work performance. *Id*. Appellate courts have cautioned that anti-

discrimination statutes do not operate as "general civility codes," *see Faragher v. City of Boca

Raton*, 524 U.S. 775, 788 (1998), and "[n]ot all unpleasant conduct creates a hostile work

environment." *Williams v. Kansas City*, 223 F.3d 749, 753 (8th Cir. 2000). Eighth Circuit

precedent "sets a high bar" for establishing conduct that is "sufficiently severe or pervasive." *Id*.

Applying Eighth Circuit caselaw to the facts of this case, the Court holds Plaintiff cannot

establish the fourth element. Clearly the allegations of David Thomas telling Plaintiff that she was

"sexy" and "fly," blowing in her ear and down her neck, and then telling her that he knew how old

she was, but "age didn't make a difference," would be examples of sexual harassment. The effect

on Plaintiff's work environment was made worse by the fact that she was aware that two agents

experienced similar harassing behavior at Mr. Thomas's hands when he played with their hair and

touched them. Even assuming that Plaintiff being called a "bitch" by an agent during training was

some form of sexual harassment (as opposed to being used as a vulgar synonym for "jerk"—which

appears to be how this insult was used), the above conduct is not sufficiently severe and pervasive

that it establishes a prima facie case of a hostile work environment. *See Lopez*, 989 F.3d at 663

(holding an employee touching the plaintiff "almost every time he saw her in the months

following," touching her back, invading her personal space, blowing on her finger while calling

her "baby," and glaring at her for long periods, was not enough to establish a hostile work

environment) (citing *LeGrand v. Area Res. for Cmty. & Hum. Servs.*, 394 F.3d 1098, 1100–03 (8th

Cir. 2005) (holding three unwelcome sexual advances over nine months was not enough because

"none ... was physically violent or overtly threatening" even when two instances involved overtly

sexual touching)). Even though, in the words of the Eighth Circuit, this conduct deserves

condemnation and Mr. Thomas should be "embarrassed and ashamed" of his actions, it was not severe or pervasive enough to create an objectively hostile or abusive work environment. *Lopez*, 989 F.3d at 663. Accordingly, Maximus is entitled to summary judgment on Plaintiff's hostile work environment claim.

Likewise, Plaintiff cannot establish gender discrimination as a matter of law. In cases such as this one, where the plaintiff has no direct evidence of discrimination,[3] courts apply a three-step burden shifting analysis initially set forth in *McDonnell Douglas Corp. v Green*, 411 U.S. 792 (1973). *Main v. Ozark Health, Inc.*, 959 F.3d 319, 324 (8th Cir. 2020). Under this analysis, a plaintiff must first establish a prima facie case of gender discrimination. *Id.* If plaintiff can do so then, the analysis proceeds to step two. *Id.* Here, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* At step three the burden shifts back to the plaintiff to show that the employer's reason(s) were pretextual. *Id.*

Maximus is entitled to summary judgment on this claim because there is no evidence from which a reasonable jury could infer that gender motivated Plaintiff's termination. To establish a prima facie case of gender discrimination under Title VII, Plaintiff must show (1) she is a member of a protected class; (2) she was qualified for her job; (3) she suffered an adverse employment action; and (4) there are facts that give rise to an inference of unlawful gender discrimination. *Fiero v. CSG Sys.*, 759 F.3d 874, 878 (8th Cir. 2014). A plaintiff may satisfy the fourth element through different types of evidence, *Lewis v. Heartland Inns of Am., L.L.C.*, 591 F.3d 1033, 1040 (8th Cir. 2010), but the plaintiff "must present *some* evidence indicating the treatment she received would not have occurred but for her sex." *Meriano v. Barr*, No. 4:18-cv-00401-SRB, 2019 WL 6883812, at *7 (W.D. Mo. Dec. 17, 2019) (emphasis in original).

---

[3] By applying the *McDonnell Douglas* burden-shifting framework to this case, Plaintiff appears to agree that it should apply to this case. Opp'n at 34-35, ECF No. 66.

Viewed in the light most favorable to Plaintiff, the record here supports an inference that Plaintiff was fired because her supervisor—who was a women—disliked Plaintiff and retaliated against her for complaining about her son sexually harassing her, not because Plaintiff is a woman. Plaintiff's argument that the "temporal proximity" to the harassment she suffered from Mr. Thomas somehow establishes gender discrimination is unavailing. While Ms. Thomas' advocating successfully for Plaintiff's termination after Plaintiff reported Mr. Thomas' harassment establishes a retaliation claim (discussed below), it does not establish a claim for *gender discrimination*. Plaintiff's contention that it was gender discrimination because Mr. Thomas did not sexually harass any men, is not persuasive. Thus, Maximus is entitled to summary judgment on Plaintiff's gender discrimination claim, and the Court need not address the second and third steps in the *McDonnell Douglas* analysis.

**B.      Plaintiff cannot establish an age discrimination claim.**

The record also shows Plaintiff cannot establish an age discrimination claim. To establish a prima facie case of age discrimination under the ADEA, Plaintiff must establish she: (1) was at least 40 years old; (2) was terminated from employment; (3) was meeting her employer's reasonable expectations at the time of the discharge; and (4) was replaced by an individual who was substantially younger. *Haigh v. Gelita USA, Inc.*, 632 F.3d 464, 468 (8th Cir. 2011). Where, as here, the plaintiff is not replaced by a specific individual, the Eighth Circuit replaces the fourth element with a different element: whether age was a factor in the employer's decision to terminate.

Plaintiff cannot establish this last element. There is no admissible evidence in the record[4] that age played any role in the decision to end Plaintiff's employment. Further, at least two of the three individuals who participated in the decision to end Plaintiff's employment were older than

---

[4] Plaintiff argues nine younger call center workers were treated more favorably than her, but this argument is based on inadmissible hearsay.

Plaintiff (who was 46 at the time); Reitz was 49, Montalvo-Silburn was 53. Both of these individuals had more decision-making power than Ms. Thomas, whose age is not in the record.

## C.        Plaintiff cannot establish a disability discrimination claim.

Likewise, Plaintiff has no claim for disability discrimination. To establish a prima facie case of disability discrimination, Plaintiff must establish (1) she is a disabled person as defined by the ADA; (2) she was qualified to perform the essential functions of her job with or without reasonable accommodation; and (3) she suffered an adverse employment action because of her disability. *Faulkner v. Douglas Cnty. Neb.*, 906 F.3d 728, 732-33 (8th Cir. 2018). Assuming for the sake of argument Plaintiff is disabled as defined in the ADA, and that Maximus was on notice that she had a disability, this claim fails because there is insufficient evidence in the record that she was fired because of any disability.

Plaintiff's related claims, that she was fired because Maximus "regarded her" as being disabled, or that she was subject to a hostile work environment due to her disability, fail for a similar reason. To establish a "regarded as" claim under the ADA, Plaintiff must show she was subjected "to an action prohibited under [the ADA] *because of* an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A) (emphasis added). To establish a hostile work environment claim under the ADA, Plaintiff must prove: (1) she was a member of the class of people protected by the statute; (2) she was subjected to unwelcome harassment; (3) the harassment resulted from her membership in the protected class; and (4) the harassment was severe enough to affect the terms, conditions, or privilege of her employment. *Shaver v. Indep. Stave Co.*, 350 F.3d 716, 720 (8th Cir. 2003). This "harassment must be both subjectively hostile or abusive to the victim and severe and pervasive enough to create an objectively hostile or abusive work environment—an

13

environment that a reasonable person would find hostile or abusive." *Id*. at 721. "Conduct that is merely rude, abrasive, unkind, or insensitive does not come within the scope of the law." *Id*. But Plaintiff has no evidence that she was either terminated or subjected to severe unwelcome harassment, because of an actual or perceived impairment. Granted, there is evidence that Plaintiff was subjected to some questionable comments because of a disability: Thomas told Plaintiff to get her "anxiety in check and be a big girl," and Reitz called Plaintiff a "complainer" and told her he was going to "designate a national complaint day just for" her. But this evidence does not demonstrate sufficiently severe or pervasive harassment to create an objectively hostile or abusive work environment under Eighth Circuit law. *See Sellers v. Deere & Co.*, 791 F.3d 938, 945 (8th Cir. 2015) (holding disability-based harassment not severe enough as a matter of law when the plaintiff alleged two incidents of his supervisor yelling, spitting, pushing furniture, and pounding his fists at the plaintiff, and plaintiff claimed he was given too much work, not allowed to use conference room, wrongfully blamed for a failed audit, and generally mistreated).

Finally, Plaintiff argues some part of her ADA claim still survives summary judgment because implicit within her ADA claim is a failure to accommodate claim which Maximus did not address in its motion for summary judgment. This argument is unavailing. A failure to accommodate claim is a separate and distinct ADA claim from an ADA discrimination claim. *See Cunningham v. Prairie Farms Dairy*, No. C19-1022-LTS, 2021 WL 91624, at *5 (N.D. Ia. Jan 11, 2021). Count III alleges Plaintiff's ADA claim, and it does not allege a claim for failure to accommodate. Compl. ¶¶ 87-101, ECF No. 1. Plaintiff cannot raise such a claim for the first time on summary judgment.

**D.** **Plaintiff has a prima facie claim for retaliation under Title VII.**

To establish a *prima facie* case of retaliation under Title VII, Plaintiff must show: (1) she engaged in statutorily protected conduct; (2) she suffered an adverse employment action; and (3) a causal connection exists between the two. *Depriest v. Milligan*, 823 F.3d 1179, 1187 (8th Cir. 2016).

For summary judgment purposes, the facts are that Plaintiff engaged in protected activity on October 28, 2019, when she reported to Anita Thomas that David Thomas made sexual comments to Plaintiff that she was "sexy" and "fly," came into Plaintiff's office and blew in her ear and down her neck, then told Plaintiff he knew how old she was, but "age didn't make a difference." Plaintiff also told Anita Thomas that two other agents had reported that Mr. Thomas was sexually harassing them by coming up to them and playing with their hair and touching them, and they did not like it.

Instead of relaying Plaintiff's report to management, Ms. Thomas drew up paperwork that alluded to an incident three weeks prior where Plaintiff did nothing wrong and recommended Plaintiff's termination. Further, she participated in the decision to terminate Plaintiff along with Reitz and Montalvo-Silburn. On November 1, 2019, Plaintiff was terminated in a meeting with Montalvo-Silburn, Reitz, and Ms. Thomas.

These facts, and reasonable inferences from these facts, establish: (1) Plaintiff engaged in statutorily protected conduct by reporting sexual harassment to her supervisor; (2) Plaintiff suffered an adverse employment action, namely her termination; and (3) a causal connection between the two, namely, Ms. Thomas caused Plaintiff to be fired because she reported Ms. Thomas' son sexually harassed Plaintiff and two other employees.

Maximus's argument that it is entitled to summary judgment on this claim relies on its version of certain alleged facts (i.e., Plaintiff never made a formal report, the machinery for Plaintiff's termination for legitimate reasons had been set in motion well before October 28, etc.) which are disputed or not viewed in the light most favorable to Plaintiff. While Maximus is free to present its evidence of these alleged facts at trial and argue that Plaintiff was fired for lawful reasons, on this record, Maximus is not entitled to summary judgment on this claim.

**E.      Plaintiff's common law wrongful discharge claim is preempted by statute.**

Maximus argues, and Plaintiff concedes, that Plaintiff's common law wrongful discharge claim is preempted because ample statutory remedies exist. Accordingly, the Court holds Maximus is entitled to summary judgment on this claim.

## Conclusion

For the reasons discussed above, Maximus' motion for summary judgment is GRANTED IN PART. Summary judgment is entered in Maximus' favor on all of Plaintiff's claims except the Title VII retaliation claim.

**IT IS SO ORDERED.**

Date:   August 8, 2022                                           /s/ Greg Kays
                                                                 GREG KAYS, JUDGE
                                                                 UNITED STATES DISTRICT COURT